**IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA**

Spring 2025 Term

_____

No. 24-ICA-67

_____

HULL PROPERTY GROUP, LLC, and
CHARLES WV MALL, LLC,
Defendants Below, Petitioners

v.

QUARRIER ST LLC,
Plaintiff Below, Respondent

and

U.S. BANK NATIONAL ASSOCIATION, successor by merger to LASALLE BANK
NATIONAL ASSOCIATION, as Trustee for BEAR STEARNS COMMERCIAL
MORTGAGE SECURITIES, INC., COMMERCIAL MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-TOP28 and C-III ASSET MANAGEMENT LLC, f/k/a
CENTERLINE SERVICING, INC.,
Defendants Below, Respondents.

FILED

**March 10, 2025**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

_____

Appeal from the Circuit Court of Kanawha County

Honorable Maryclaire Akers, Judge

Civil Action No. 22-C-128

AFFIRMED

_____

Submitted: February 5, 2025

Filed: March 10, 2025

Timothy M. Miller, Esq.
Robert M. Stonestreet, Esq.
Austin D. Rogers, Esq.
Babst Calland Clements &
Zomnir, P.C.
Charleston, West Virginia
Counsel for Petitioners

Isaac R. Forman, Esq.
Kayla S. Reynolds, Esq.
Hissam Forman Donovan
Ritchie PLLC
Charleston, West Virginia
Counsel for Respondent
Quarrier St LLC

Arie M. Spitz, Esq.
Jason L. Holliday, Esq.
Dinsmore & Shohl LLP
Charleston, West
Virginia
Counsel for Respondent
U.S. Bank National
Association

JUDGE DANIEL W. GREEAR delivered the Opinion of the Court.
JUDGE S. RYAN WHITE, voluntarily recused.
JUDGE LAURA V. FAIRCLOTH, sitting by temporary assignment.

GREEAR, JUDGE:

Hull Property Group, LLC, and Charles WV Mall, LLC (collectively "Hull Group") appeal the January 16, 2024, order of the Circuit Court of Kanawha County granting U.S. Bank National Association, successor by merger to Lasalle Bank National Association, as Trustee for Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-Top28 and C-III Asset Management LLC, f/k/a Centerline Servicing, Inc.'s (collectively "Trust Respondents") motion for partial summary judgment with respect to count I of Quarrier St LLC's ("Quarrier") underlying complaint alleging breach of contract. Upon review of this matter, we find no error in the circuit court's award of partial summary judgment to the Trust Respondents as the *Assignment and Assumption of Leases and Contracts* ("Assignment Agreement") assigned the *Demolition Agreement* at issue to Hull Group. Accordingly, we affirm the January 16, 2024, order.

On appeal, Quarrier filed two cross-assignments of error. Due to the procedural nature of Quarrier's first cross-assignment of error, this Court lacks jurisdiction to grant the requested relief. We conclude that Quarrier's second cross-assignment of error is without merit.

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In April of 2018, Quarrier purchased the property at issue. This property, located in Charleston, West Virginia, included a building in which a Sears store previously operated (hereinafter "Sears building"). The Sears building was directly adjacent to and contained a common wall with the Charleston Town Center Mall ("Mall"). On August 13, 2020, the Trust Respondents and Quarrier entered into a *Demolition Agreement* relating to the planned demolition of the Sears building. This *Demolition Agreement* placed certain conditions upon the manner in which Quarrier was permitted to demolish the common wall, including the construction of a temporary common wall, and discussed the "impact and effect on the Mall Property, and the minimizing of any such impact and effect." The *Demolition Agreement* contained a successor in interest clause, which stated, "[t]his Agreement shall be binding upon and inure to the benefit of each of the parties hereto, and their respective heirs, successors, assigns, beneficiaries, personal representatives, subsidiaries, parents, and affiliated or related legal entities, as applicable."

On April 19, 2021, Hull Group and the Trust Respondents entered into the *Agreement of Purchase and Sale* ("*P&SA*") governing Hull Group's purchase of the Mall. On May 10, 2021, Hull Group finalized its "as is" purchase of the Mall. In connection with the sale, Hull Group and the Trust Respondents executed numerous ancillary agreements, including the *Assignment Agreement* and a *Confidentiality Agreement* pertaining to the

review documents provided by the Trust Respondents. The *Assignment Agreement* states, in relevant part:

> NOW, THEREFORE, for and in consideration of the receipt of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to Assignor [Trust Respondents] in hand paid by Assignee [Hull Group] to Assignor [Trust Respondents], the receipt and sufficiency of which are hereby acknowledged, Assignor [Trust Respondents] does hereby SELL, ASSIGN, CONVEY, TRANSFER, SET OVER, and DELIVER unto Assignee [Hull Group] all of Assignor's [Trust Respondents'] right, title and interest, if any, in and to the following:
>
> (a) all oral or written agreements pursuant to which any portion of the Real Property or Improvements is used or occupied by anyone other than Assignor [Trust Respondents] (collectively, "Leases"); provided, however, that Assignor [Trust Respondents] reserves and retains for itself all claims and causes of action accruing to Assignor [Trust Respondents] with respect to the Leases prior to the effective date hereof; and
>
> (b) the assignable contracts and agreements relating to the upkeep, repair, maintenance or operation of the Real Property, Improvements or Personal Property, including specifically, without limitation, the assignable equipment leases described on Exhibit B attached hereto (collectively, "Contracts"); provided, however, that Assignor [Trust Respondents] makes no representation or warranty with respect to the assignability of any of the Leases and Contracts.

After acquiring the Mall, Quarrier contacted Hull Group regarding the *Demolition Agreement*, to which Hull Group objected, claiming that it had no knowledge of said agreement prior to purchase of the Sears building. Over Hull Group's objection,

3

Quarrier applied for the required demolition permit with the City of Charleston. The City of Charleston denied Quarrier's initial permit request due to Hull Group's objection.

Hull Group and Quarrier argued that the Trust Respondents failed to disclose the existence of the *Demolition Agreement* to Hull Group prior to closing. Thus, Hull Group questioned whether it was bound by the *Demolition Agreement*. On February 14, 2022, Quarrier filed its lawsuit below against Hull Group, the Trust Respondents, and the City of Charleston, seeking to force the issuance of a demolition permit and to recover damages associated with the delay in its ability to demolish the Sears building and commence construction of a new hotel building. Quarrier asserted various claims against Hull Group stemming from an alleged breach of the *Demolition Agreement* and continuous interference with the scheduled demolition of the Sears building. Quarrier also asserted various claims against the Trust Respondents resulting from an alleged failure to ensure the *Demolition Agreement* was properly assigned to Hull Group.

On May 19, 2022, the City of Charleston issued a demolition permit for the Sears building, over Hull Group's objection and without Hull Group's consent.[1] In response to the demolition permit, Hull Group filed a motion for preliminary injunction to cease Quarrier's demolition efforts. A hearing on this motion was held in circuit court on July 12, 2022. On August 9, 2022, the court denied the motion for preliminary injunction and

---

[1] The City of Charleston was subsequently dismissed from the underlying case.

4

concluded that Quarrier had a legal right to continue its work pursuant to the terms and conditions of the demolition permit issued by the City of Charleston. Over Hull Group's continuing objection, Quarrier commenced demolition of the Sears building in August of 2022, and completed most of the demolition by early 2023. As part of the demolition, Quarrier demolished the common wall and constructed a new replacement wall, which now serves as the exterior wall for the Mall. In response, Hull Group filed multiple counterclaims against Quarrier arising from the demolition of the common wall and negligent construction of the replacement wall.

In November of 2022, Quarrier filed its motion for partial summary judgment on its breach of contract claims asserted against Hull Group and the Trust Respondents. In September of 2023, the Trust Respondents filed a competing motion for partial summary judgment on Quarrier's breach of contract claim, asserting that the *Demolition Agreement* was assigned to Hull Group, as a matter of law, pursuant to the *P&SA* and *Assignment Agreement*.

Following a hearing, on December 11, 2023, the circuit court denied Quarrier's motion finding that a genuine issue of material fact remained as to whether the Trust Respondents intended to convey, and Hull Group intended to accept, the assignment of the *Demolition Agreement*. At that time, the circuit court made no ruling on the Trust Respondents' motion for partial summary judgment. Following the circuit court's order,

5

the Trust Respondents submitted supplemental evidence supporting their motion for partial summary judgment.[2]

On December 21, 2023, the circuit court held a hearing on the Trust Respondents' motion for partial summary judgment. On January 16, 2024, the circuit court entered its order granting the Trust Respondents' motion pertaining to count I of Quarrier's complaint, finding the *Assignment Agreement* unambiguously conveyed and assigned the *Demolition Agreement* to Hull Group. A January 26, 2024, Rule 54(b) certification order followed, permitting this appeal, noting that the issue of the assignment of the *Demolition Agreement* to Hull Group was "central to most, if not all, the issues in this case."

## II.     STANDARD OF REVIEW

Decisions to grant or deny summary judgment are reviewed *de novo*. Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). The Supreme Court of Appeals of West Virginia ("SCAWV") has explained that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." *Id.* at 190, 451 S.E.2d at 756, Syl. Pt. 3. Our review of this matter is further guided by the SCAWV recognition,

---

[2] The supplemental evidence included the transcript of the August 16, 2023, deposition of Patrick Muller, a Rule 30(b)(7) representative of Hull Group, and the transcript of the August 31, 2022, deposition of Greg Jordan, the operations manager for the Mall.

in syllabus point one of *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995), that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Likewise, as to contractual agreements, the SCAWV has also determined that "[i]t is the province of the court, and not of the jury, to interpret a written contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W. Va. 421, 191 S.E. 550 (1937) (quoting Syl. Pt. 6, *Franklin v. T.H. Lilly Lumber Co.*, 66 W. Va. 164, 66 S.E. 225, 226 (1909)). With these standards in mind, we now consider the issues raised on appeal.

### III.    DISCUSSION

On appeal, Hull Group alleges three separate assignments of error. However, each of these assignments of error argues the impropriety of the circuit court's determination that the *P&SA* and *Assignment Agreement* unambiguously conveyed and assigned the Trust Respondents' interest in the *Demolition Agreement* to Hull Group. Accordingly, we limit our review here to the propriety of the circuit court's decision in that regard and find that our ruling on that issue is dispositive of all the assignments of error raised by Hull Group. *See Tudor's Biscuit World of Am. v. Critchley,* 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (consolidating assignments of error).

### A.  Hull Group

Prior to addressing the assignments of error raised by Hull Group on appeal, we note the circuit court's January 16, 2024, order specifically addressed Quarrier's

7

allegations of breach of contract, as applied to the Trust Respondents alone. Therefore, we must first determine whether Hull Group now possesses standing to appeal an order granting another party's motion, which is similar in nature to the motion brought by Hull Group. Generally, "standing is defined as '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.'" *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 94, 576 S.E.2d 807, 821 (2002) (quoting *Standing*, *Black's Law Dictionary* (7th ed.1999)). Elements for establishing standing have been articulated by the SCAWV in Syllabus point 5 of *Findley* as follows:

> Standing is comprised of three elements: First, the party attempting to establish standing must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.

213 W.Va. 80, 576 S.E.2d 807.

The procedural facts of this case provide Hull Group's standing to bring this appeal. First, as a consequence of the partial summary judgment order, Hull Group has sustained an injury-in-fact. In September of 2023, Hull Group filed its own motion for partial summary judgment. As a result of the circuit court's granting of the Trust Respondents' motion for partial summary judgment, a final determination has now been made precluding issues that were the subject of Hull Group's motion for partial summary

8

judgment and those rights subject thereto shall not be subject to reconsideration or further assertion absent an appeal of the current order.

Given the nature and extent of the issue resolved in the January 16, 2024, order, we find that there is a causal connection between the injury and the conduct forming the basis for the lawsuit. With the circuit court's determination regarding the assignment of the *Demolition Agreement*, Hull Group has increased liability concerning the allegations contained in Quarrier's complaint. Such issue preclusion can only be addressed through a favorable decision of this Court. Accordingly, we find that Hull Group possesses standing to appeal the circuit court's January 16, 2024, order granting the Trust Respondents' motion for partial summary judgment.

Turning to the assignments on the appeal, Hull Group argues that the *P&SA* and the *Assignment Agreement* are ambiguous as to whether the Trust Respondents conveyed, and Hull Group accepted, an assignment of the *Demolition Agreement* in connection with the sale of the Mall. Hull Group further alleges this ambiguity creates questions of fact regarding the various documents which should be determined by a jury. We disagree.

We approach Hull Group's contentions mindful that these agreements, signed by both parties, represent the negotiated terms between the parties and are subject to interpretation in accordance with West Virginia law. In construing the terms of an

9

agreement, we are guided by the long-standing canons of contractual interpretation set forth by the SCAWV. Contracts containing unambiguous language must be construed according to their plain and natural meaning. *Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996). Moreover, the mere fact that parties do not agree to the construction of a contract does not render it ambiguous; rather the question of contract ambiguity is a question of law to be determined by the court. Syl. Pt. 1, *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W. Va. 252, 162 S.E.2d 189 (1968).

Contract language is typically considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligation undertaken. *Supervalu Operations, Inc. v. Ctr. Design, Inc.*, 206 W. Va. 311, 315, 524 S.E.2d 666, 670 (1999) (per curiam) (citing *Fraternal Order of Police v. Fairmont*, 196 W.Va. at 101, 468 S.E.2d at 716). If language in a contract is found to be plain and unambiguous, such language must be applied according to such meaning. "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." Syl. Pt. 3, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962). Courts are to ascertain the meaning of the agreement as manifested by its language and enforce it as written, not rewrite the terms of contact between the parties. Syl. Pt. 1, *Bennett v. Dove*, 166 W. Va. 772, 277 S.E.2d 617 (1981) ("A valid

written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.").

In the present case, the *Assignment Agreement*, by its explicit terms, is written to encompass all agreements "relating to the upkeep, repair, maintenance or operation of the Real Property, Improvements or Personal Property," including "specifically, without limitation" the documents described on Exhibit B[3] to that document. In construing this agreement,

> it is the duty of the court to construe it as a whole, taking and considering all the parts together, and giving effect to the intention of the parties wherever that is reasonably clear and free from doubt, unless to do so will violate some principle of law inconsistent therewith.

Syl. Pt. 10, *Arnold v. Palmer*, 224 W. Va. 495, 503, 686 S.E.2d 725, 733 (2009) (quoting Syl. Pt. 5, *Hall v. Hartley*, 146 W.Va. 328, 119 S.E.2d 759 (1961)). "It is the safest and best mode of construction to give words, free from ambiguity, their plain and ordinary meaning." Syl. Pt. 3, *Bennett*, 166 W. Va. at 772, 277 S.E.2d at 618 (quoting Syl. Pt. 4, *Williams v. South Penn Oil Co.*, 52 W.Va. 181, 43 S.E. 214 (1902)).

Turning to the specific contractual provisions, we find that the express language in the *Assignment Agreement*, stating "relating to the upkeep, repair, maintenance

---

[3] Exhibit B contained a description of service agreements. All parties agree the Demolition Agreement was not listed in Exhibit B.

11

or operation of the Real Property, Improvements or Personal Property," and "specifically, without limitation" clearly shows the intent of the parties to include contracts that fall within the general scope of the agreement even if not specifically referenced by the Trust Respondents. We find no ambiguity in such language.

With respect to the contractual terms, we defer to the plain meaning of the words used by the parties. "Operation" is quality or state of being functional. *Operation*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003). Further, "repair" is to restore by replacing a part or putting together what is torn or broken. *Repair*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003). The plain meaning of "operation" and "repair" support the circuit court's finding that the *Demolition Agreement*, which expressly addressed the removal and reconstruction of an exterior wall utilized by the Mall, dealt with the "upkeep, repair, maintenance or operation" of the Mall. Accordingly, we conclude that the *Demolition Agreement* unambiguously falls within the general scope of the *Assignment Agreement*.

Hull Group alleges that a question of fact exists as to whether the Trust Respondents possessed a legal obligation to formally disclose the *Demolition Agreement*. We disagree. The determination of a legal duty is generally a question of law for the court to determine. *See* Syl. Pt. 5, *Eastern Steel Constructors, Inc. v. City of Salem*, 209 W. Va. 392, 549 S.E.2d 266 (2001) ("The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination

12

of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law[.]"). Here, we find no such disclosure is required by law nor does the *P&SA* require such disclosure to ensure compliance.

As demonstrated by the language of the *P&SA*, the parties agreed to an "as is" sale of real and personal property. Section 7 of the *P&SA* states:

Section 7. **AS IS Sale.**

A. Purchaser expressly acknowledges that, except as expressly provided herein, the Property is being sold and accepted **AS IS, WHERE-IS, WITH ALL FAULTS**, and Seller makes no representations or warranties, express or implied, with respect to the physical condition or any other aspect of the Real Property, including, without limitation, […] or (xii) any other matter whatsoever affecting the stability, integrity, fitness for use or other condition or status of the land or any buildings or improvements situated on all or part of the Property or any other aspect of the Property or any part thereof (collectively, the "Property Conditions") . . . .

B. If and to the extent that Seller delivers or makes available documents, reports (including any environmental reports) or other writings concerning the Property (collectively, with the Review Items described in Section 4, the "Review Items") to Purchaser, all such Review Items shall be delivered or made available without any representation or warranty as to the completeness or accuracy of the data or information contained therein, and all such Review Items are furnished to Purchaser solely as a courtesy, and Seller has neither verified the accuracy of any statements or other information therein contained, the method used to compile such information nor the qualifications of the persons preparing such information. [emphasis added]

13

The use of an "as is" provision in a real estate sales contract is generally intended to negate the existence of any warranty as to the particular fitness or condition of the property. This use of this clause simply means that the purchaser acknowledges that it takes the premises at issue in its present condition as of the date of the contract. *Hinerman v. Rodriguez*, 230 W. Va. 118, 125-26, 736 S.E.2d 351, 358-59 (2012) (per curiam). While the usage of an "as is" provision conveys the property with all faults, it does not relieve the seller's obligation to disclose conditions which could not be found by the buyer through a reasonable and diligent inspection. *See* Syl. Pt. 5, *Logue v. Flanagan*, 213 W. Va. 552, 556, 584 S.E.2d 186, 190 (2003) (per curiam) ("The existence of an 'as is' clause in a contract of sale for real estate will not relieve the vendor of his obligation to disclose a condition which substantially affects the value or habitability of the property and which condition is known to the vendor, but not to the purchaser, and would not be disclosed by a reasonable and diligent inspection."). Section 9 of the *P&SA* expressly provided for Hull Group to be permitted time for such an inspection.

Hull Group contends that it assumed and should only be bound by those documents it specifically accepted during the sale process. In support of this contention, it relies on its ability to reject certain leases and agreements before closing as provided in Section 1.H. of the *P&SA*:

> The assignable service and maintenance contracts and equipment leases relating to the Real Property that are in Seller's or Seller's representatives' possession and which Buyer advises Seller it desires to acquire ("Contracts") (all other service and maintenance contracts and equipment leases

shall be terminated by Seller at or before Closing at Seller's expense).

Hull Group maintains that "Contracts" under the *P&SA* and *Assignment Agreement* were to be the service and maintenance contracts for the Mall that Hull Group expressly identified as contracts to be assigned as part of the transaction, limited only to those provided directly prior to closing.

The Trust Respondents and Hull Group agree that the *Demolition Agreement* was not directly provided in any exhibit nor was it contained in the "due diligence" vault of documents the Trust Respondents provided to Hull Group. The only identified contracts Hull Group wished to acquire were: (1) water treatment contract for the air conditioning system; (2) landscaping contract; (3) Suddenlink internet contract; and (4) telephone contract. Thus, Hull Group argues that any contract outside of these should have terminated at the point of closing. While this argument may be generally applicable in commercial transactions, it does not align with the express language of the *P&SA* and its ancillary agreements in this "as is" transaction. The language contained within the *P&SA* and the *Assignment Agreement* speak to a broader assignment between the parties, which includes agreements not directly provided to Hull Group.

While the Trust Respondents were provided copies of some of the contracts and agreements, through various means, such as a "due diligence" vault and exhibits, the fact remains that these leases and agreements were provided solely for convenience of the

Trust Respondents and Hull Group and were not subject to any warranty of completeness.

Paragraph 4 of the parties' *Confidentiality Agreement* provides:

> The Potential Purchaser understands and acknowledges that Broker and Owner do not make any representations or warranties to the accuracy or completeness of the Informational Materials and that the information used in the preparation of the Informational Materials was furnished to Broker by others and has not been independently verified by Broker and is not guaranteed as to completeness or accuracy.

Under these general terms of the transaction, Hull Group was not entitled to rely on the completeness of the documents listed in the "due diligence" vault or those actually provided. This finding is consistent with the express terms of the *Assignment Agreement*, which specifically notes that the assigned matters included "without limitation" those agreements described in Exhibit B. Thus, the *Assignment Agreement* expressly contemplates an assignment of agreements not specifically listed or disclosed by the Trust Respondents. We find this to be consistent with the nature of the parties' transaction and aligned with the language of the documents executed by the parties herein.

Therefore, we conclude the *P&SA* and its ancillary agreements, specifically the *Assignment Agreement*, are unambiguous and evidence an "as is" transaction. Further, we conclude that the *P&SA* and its ancillary agreements demonstrate and memorialize the intent of the parties to assign ALL agreements falling within the parameters of the *Assignment Agreement* to the purchaser, regardless of whether the agreements were specifically and particularly disclosed or provided to the purchaser. Hull Group's

16

knowledge, actual or otherwise, is of no consequence, and is a hollow attempt to distort the express language of the parties' agreements. Accordingly, we affirm the circuit court's conclusion that the Trust Respondents successfully assigned the *Demolition Agreement* to Hull Group. Accordingly, there are no genuine issues of material fact concerning the assignment of the *Demolition Agreement* or the duty to disclose the *Demolition Agreement*.

Hull also argues that a question of fact exists as to the existence of consideration for the *Assignment Agreement*. However, as the circuit court found, the *Assignment Agreement* on its face states that consideration of $10, and other good and valuable consideration, was paid in exchange for the assignment. It is well established in West Virginia jurisprudence that it is not within the province of the Court to assess the adequacy of consideration or to determine whether the consideration represented a good business deal. *Janes v. Felton,* 99 W. Va. 407, 129 S.E. 482 (1925). Accordingly, we find no reason to disturb the circuit court's determination that no genuine issue of material fact existed with respect to consideration given the undisputed recitation of consideration contained in the *Assignment Agreement*.

## B. Quarrier

In response to the issues asserted on appeal, Quarrier raises two cross-assignments of error. First, Quarrier argues that, in light of its conclusion that the *Assignment Agreement* unambiguously conveyed the *Demolition Agreement* to Hull Group, the circuit court's earlier order denying Quarrier's previously filed motion for

17

partial summary judgment on the basis that the *Assignment Agreement* is ambiguous was erroneous. Second, Quarrier alleges that the circuit court erred in granting the Trust Respondents' motion for partial summary judgment because the Trust Respondents, as the assignor of the *Demolition Agreement*, remain bound to such Agreement regardless of whether it properly assigned its rights pursuant to the Restatement (Second) of Contracts. Upon review, we find Quarrier's first cross-assignment of error involves an interlocutory order not properly before the Court. *See* West Virginia Code § 51-11-4(d) (2024). Accordingly, we do not have jurisdiction to address the first cross-assignment of error. As more fully discussed below, we find no merit in Quarrier's second cross-assignment of error.

We begin by noting Quarrier does not dispute the circuit court's finding that the *Demolition Agreement* was assigned to Hull Group through the *P&SA* and the *Assignment Agreement*. Accepting this determination, Quarrier is now attempting to invoke the prior interlocutory order denying its motion for partial summary judgment, which was not an appealable order providing this court jurisdiction for review. Here, Quarrier never sought certification of the order denying its motion for partial summary judgment, nor did it appeal by means of a writ. However, Quarrier is now asserting that the two motions are sufficiently intertwined such that the relief in one must accompany the other. However, we find no jurisdiction for our review of this Order.

As discussed in Syllabus Point 6, in *Riffe v. Armstrong*,

18

> [w]here an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken.

197 W. Va. 626, 631, 477 S.E.2d 535, 540 (1996) (internal citations omitted). "In the context of an appeal under Rule 54(b) of an order that does not fully resolve the litigation below, the foregoing authority permits consideration of preceding non-appealable orders only when the errors in the Rule 54(b) order arise from the earlier non-appealable orders." *WW Consultants, Inc. v. Pocahontas Cnty. Pub. Serv. Dist.*, 248 W. Va. 323, 331, 888 S.E.2d 823, 831 (2023).[4]

---

[4] At oral argument, counsel for Quarrier argued that this Court has jurisdiction over the circuit court's December 11, 2023, order denying Quarrier's motion for partial summary judgment because the ruling in that order is "inextricably intertwined" with the January 16, 2024, order on appeal. Quarrier's counsel specifically invoked the SCAWV's decision in *Cabell County Commission Comm'n v. Whitt*, 242 W. Va. 382, 836 S.E.2d 33 (2019), arguing that *Whitt* established that an appellate court has "appellate jurisdiction over issues that are inextricably intertwined with a subject that is the proper subject of an appeal."

We find that Quarrier's interpretation overstates *Whitt*. In *Whitt*, the SCAWV recognized that many rulings predicated on immunity—in that case, the denial of a motion for summary judgment predicated on an immunity defense—are subject to interlocutory appeal under the collateral order doctrine. *See Cabell Cnty. Comm'n v. Whitt*, 242 W. Va. 382, 387, 391, 836 S.E.2d 33, 38, 42 (2019). The SCAWV also recognized that, on a collateral order appeal of an immunity decision, the appellate court can review rulings that are "'inextricably intertwined with the decision of the lower court to deny . . . immunity.'" *Id.* at 391, 836 S.E.2d at 42 (quoting *Henry v. Purnell*, 501 F.3d 374, 376 (4th Cir. 2007)).

However, Hull Group did not appeal the January 16, 2024, order under the collateral order doctrine; the order was certified as a final order pursuant to Rule 54(b) of the West Virginia Rules of Civil Procedure. Moreover, neither the order on appeal nor the December 11, 2023, order addresses immunity. Quarrier appears to be asking this Court to expand the reasoning of *Whitt* beyond the context of the collateral order doctrine and immunity rulings

It is undisputed that the order denying Quarrier's motion for partial summary judgment is an interlocutory order not subject to appeal. The only partial summary judgment before this Court was granted solely to the issue contained in count I of Quarrier's complaint and addressed the assignment of the *Demolition Agreement*. The circuit court's determination regarding such assignment is not challenged by Quarrier. Quarrier has failed to make any argument explaining how the prior unreviewable order is now reviewable pursuant to the Rule 54(b) standard. Having failed to invoke an error which arises from the current appealable order and its application to the prior interlocutory order, we find this court lacks jurisdiction to provide the relief requested by Quarrier.

Quarrier further contends, in its second cross-assignment of error, that the circuit court erred by failing to recognize potential joint liability of the Trust Respondents pursuant to Restatement (Second) of Contracts (1981). Quarrier argues that a purported promise by a promisor and their assigns does not mean that the promisor can terminate their duty by making an assignment, nor does it of itself show an assumption of duties by any assignee pursuant to the Restatement (Second) of Contracts § 323, cmt. (b) (1981). While one's delegation of performance may be effective to empower a substitute to perform on their behalf, the Trust Respondents remain subject to the duty under the *Demolition Agreement* until it has been discharged by performance or otherwise.

---

to the context of a Rule 54(b) appeal. However, because the SCAWV has already provided specific guidance on how to evaluate whether earlier interlocutory rulings in a case can be addressed in an appeal of a later Rule 54(b) order, we decline to adopt this expansive reading of *Whitt*.

20

The flaw in Quarrier's argument is that it failed to plead joint liability within count I and never argued this theory of liability before the circuit court. Quarrier's count I alleged a contractual breach based on the Trust Respondents' failure to bind Hull Group to this *Demolition Agreement*. However, nothing alleged in count I invokes joint liability if the *Demolition Agreement* is properly assigned. Accordingly, Quarrier's argument is now being raised for the first time on appeal and is not properly before this Court for consideration. The SCAWV has clearly stated that "'[o]ur general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W. Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999)." *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009).

## IV. CONCLUSION

For the foregoing reasons, the January 16, 2024, order granting partial summary judgment is hereby affirmed.

Affirmed.